FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2013 JAN -8  AM 9: 57

CLERK_____
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

UNITED STATES OF AMERICA, ex rel. )
CHRISTIE SMITH, )
)
    PLAINTIFF, )
)
v. )
)
SERENITY HOSPICE CARE, LLC, )
)
    DEFENDANTS. )
)

**CV313  001**

_____

**UNDER SEAL**

SEALED AND IMPOUNDED

**QUI TAM COMPLAINT**

Relator Christie Smith, on behalf of herself and the United States of America, alleges and claims against Defendant Serenity Hospice Care, LLC, as follows:

**JURISDICTION AND VENUE**

1.

This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False Claims Act"). Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction is also authorized under 31 U.S.C. § 3732(a).

2.

Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a), because Defendant qualifies to do business in the State of Georgia, transacts substantial business in the State of Georgia, transacts substantial business in this judicial district, and can be found here. Additionally, as herein described, Defendant committed within this judicial district acts proscribed by 31 U.S.C. § 3729. Specifically, Defendant has submitted and caused to be submitted false claims for payment for hospice services rendered in this judicial district and made or used false records or and statements material to such claims.

**PARTIES**

3.

Serenity Hospice Care, LLC ("Serenity") is based in Dublin, Georgia, and provides hospice services to patients throughout the State of Georgia. Serenity has offices in Dublin, Vidalia, Warner Robins, Milledgeville, Columbus and Peachtree City, and an in-patient facility in Dublin.

4.

Relator Christie Smith was employed by Serenity as a billing clerk at Serenity's main office in Dublin, Georgia from July, 2011 until her termination in July, 2012. In the course of her duties, Ms. Smith became aware that Serenity bills the United States: for services not provided; at a higher level than the service

2

actually given, and for hospice services provided to patients who were not eligible for hospice care. Serenity also improperly alters the records of patients on hospice care to avoid paying for medical services related to such patients' hospice diagnosis.

5.

Prior to filing this Complaint, Relator voluntarily disclosed to the Government the information upon which this action is based. To the extent that any public disclosure has taken place as defined by 31 U.S.C. §3739(e)(4)(A), Relator is the original source of the information for purposes of that Section. Alternatively, Relator has knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Relator voluntarily provided that information to the Government before filing this Complaint. Relator is serving contemporaneously herewith a statement of the material evidence in her possession upon which her claims are based.

## APPLICABLE MEDICARE RULES AND REGULATIONS

6.

Through the Medicare program, the United States provides health insurance benefits to eligible citizens, such as the elderly. *See* 42 U.S.C. §§ 1395, *et. seq.*

7.

In order to bill Medicare, a provider (such as Serenity) must submit a claim form known as a CMS Form 1500 to the appropriate fiscal intermediary (FI) or Medicare Administrative Contractor (MAC). Each time it submits a claim for payment by Medicare, therefore, a provider (such as Serenity) certifies that the claim is true, correct, and complete, and complies with all Medicare laws and regulations.

8.

Medicare provides to covered individuals a hospice benefit, pursuant to which Medicare will pay for various costs associated with hospice care provided to a patient. 42 U.S.C. § 1395x(dd). However, specific conditions, procedures and criteria must be met for a patient to receive hospice care. 42 C.F.R. § 418.00 *et seq.* Specifically, to be eligible to receive hospice care under Medicare, a patient must be certified as "terminally ill," meaning that the patient "has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course." 42 C.F.R. § 418.3. Such certification must be made both by the patient's attending physician, and the medical director for the hospice provider. 42 C.F.R. § 418.22(c). The patient then must be re-certified, by the hospice medical director, to continue to receive hospice care after the first 90 days of receiving hospice care. *Id.*

4

9.

When a patient is admitted to hospice care, that patient agrees to forego "curative" care for the condition or illness causing the patient to be terminally ill; instead, the patient agrees to accept, and the hospice provider agrees it will provide, only "palliative" care designed to make the patient as comfortable as possible during the terminal stages of his or her life.  42 C.F.R. § 418.24.

10.

When a Medicare beneficiary is admitted to hospice care, a plan of palliative care must be developed, and all care provided to the patient must be in accordance with such plan.  42 C.F.R. § 418.200.  Hospice providers are then reimbursed one of two ways: first, on a per diem basis from Medicare Part A, based upon the number of days and level of care for which hospice care will be provided, 42 C.F.R. § 418.302; second, hospice providers are entitled to bill Medicare Part A for services rendered by physicians in accordance with treatment of the patient's terminal illness.  Both of these types of reimbursement from Medicare Part A count against the hospice provider's aggregate cap.

11.

If a patient changes his or her mind and wishes to receive "curative" care for his or her terminal diagnosis, the patient must revoke his or her election of hospice care and agreement to forego curative care.

## DEFENDANT'S ILLEGAL CONDUCT

### 12.

Serenity would admit patients to hospice even when the patients' attending physician had not certified the patient as "terminally ill." Typically, this was accomplished by having a Serenity medical director sign the patients' certifications as the attending physician. In fact, just prior to an announced Medicare audit in December, 2011, Serenity "held" a "chart party" where the corporate Medical Director and the Medical Director for Serenity's Columbus office, signed scores of certifications as the "attending physician" for the patient. Serenity also re-certified as terminally ill patients who then remained on hospice care for years. Serenity also would falsify after the fact revocations and/or discharges by patients.

### 13.

Serenity also would change a patient's diagnosed terminal illness, after the admitting physician has signed off on the form by which the patient has elected to be placed into hospice care. This change to the diagnosed terminal illness is made without the knowledge, or consent, of the attending physician. It is many times made after the patient has been on hospice for a significant period of time.

### 14.

This change in diagnosed terminal illness typically occurs where the terminal illness upon which hospice was elected and which was originally

6

diagnosed by the attending physician would require Serenity to provide the patient with costly services related to the treatment and maintenance of the terminal illness. Since a hospice is prohibited from billing Medicare Part B for services related to the treatment and maintenance of a hospice patient's terminal illness, Serenity changes the diagnosed terminal illness to one which has less costly treatment and maintenance services. This way, Serenity can still bill Medicare Part B for services relating to the original terminal illness and also bill the patient's daily rate to Medicare Part A.

15.

For example, Patient R.T. was admitted to Serenity hospice in or about January 2012 with a diagnosed terminal illness of 429.9 (Heart Disease, Unspecified). A few days later, Relator was informed that Patient R.T. was going to the hospital for an issue related to that diagnosis. A few days after learning of this, Relator was informed by a Serenity employee that Patient R.T.'s diagnosis had been changed in the computer to 414.01 (Coronary atherosclerosis; of native coronary artery). On Patient R.T.'s hospice election form, the original diagnosis code of 429.9 was crossed out, error was written next to it, and 414.01 was written on the form. Then all claims were submitted with a diagnosis of 414.01 on them while the notice of election was submitted with a diagnosis of 429.9.

7

16.

Patient V.L. was admitted to Serenity hospice with a diagnosed terminal illness of COPD in or about November 2011. Patient V.L. was later hospitalized for pneumonia, which is related to the diagnosis of COPD. Approximately a week later, Patient V.L.'s diagnosed terminal illness was changed to 428 (Heart failure). Along with this change in the diagnosed terminal illness, Serenity created a new narrative to be placed in the file with the original admission date on it, to give the appearance that this had been Patient V.L.'s diagnosed terminal illness all along.

17.

Patient W.S. was admitted to Serenity in or about January 2012 with a diagnosed terminal illness of 585.6 (End Stage Renal Disease ("ERSD")). Serenity later changed Patient W.S.'s diagnosed terminal illness to 331.0 (Alzheimer's Disease) to avoid being financially responsible for Patient W.S.'s routine dialysis treatments. Serenity made this change by marking through the original diagnosis and inserting the 331.0 diagnosis code in its place.

18.

In the examples noted above, and at all other times when Serenity falsely changed the terminal illness of one of its patients, Serenity did so in an effort to avoid obligations set forth by federal and state law which require Serenity to be

8

responsible for all treatment provided to its patients which are related to the treatment and maintenance of its hospice patients' terminal illnesses.

19.

Similarly, Serenity also intentionally backdates discharge dates of its patients from hospice in order to avoid being financially responsible for services related to the treatment and maintenance of the patients' terminal illness.

20.

For example, Patient A.M. was visited at home by a Serenity employee in or about March 2012. During that visit the employee learned that Patient A.M. had been hospitalized some four days prior to the employee's at home visit. Serenity instructed the employee to error out all visits to Patient A.M. that occurred after Patient A.M.'s hospitalization and Serenity then discharged Patient A.M. effective the date of Patient A.M.'s hospitalization. This was done in an effort to avoid being financially responsible for the hospitalization of Patient A.M.

21.

Similarly, Patient J.F. received home visits from Serenity employees in or about March 2012. During these visits it was learned that Patient J.F. had been hospitalized just before these visits. Serenity instructed the employees to error out all visits to Patient J.F. that occurred after Patient J.F.'s hospitalization and Serenity then discharged Patient J.F. effective the date of Patient J.F.'s

9

hospitalization. This was done in an effort to avoid being financially responsible for the hospitalization of Patient J.F.

22.

When Serenity decides it does not want to be financially responsible for services related to the treatment and maintenance of the terminal illness of one of its patients, Serenity will falsely claim that the patient consented to revocation of their hospice benefits via telephone.

23.

For example, in or about April 2012, Patient L.G. went into the hospital to receive services related to the treatment and maintenance of Patient L.G.'s terminal illness, and Serenity was unable to get the patient or representative to consent to revocation of their hospice benefits beforehand. In an effort to avoid being financially responsible for the hospitalization, a Serenity employee put into Patient L.G.'s file a notation that they had received phone consent for revocation from Patient L.G.'s representative.

24.

In or about April 2012, Serenity wanted to revoke Patient M.F.'s hospice election in order to avoid financial responsibility for services related to the treatment and maintenance of Patient M.F.'s terminal illness. They were not able to actually get consent for revocation from Patient M.F. or Patient M.F.'s

10

representative. A Serenity employee nonetheless wrote into Patient M.F.'s file a notation that they had received phone consent for revocation from Patient M.F.'s representative.

25.

In or about March 2012, Patient B.L. had not been seen by a Serenity employee for 22 days. As a result, Serenity's software held the billing for Patient B.L. Serenity then fabricated a record of a home visit to Patient B.L. during the 22 day time period when, in fact, no Serenity employee visited Patient B.L. This false statement enabled Serenity to be paid by Medicare.

26.

In or about May 2012, Serenity failed to visit Patient Y.A. for 14 days, despite requests from Patient Y.A. and Patient Y.A.'s family. In response, Patient Y.A.'s family took Patient Y.A. to receive care elsewhere. Patient Y.A. and Patient Y.A.'s family refused to sign revocation forms. Next, a co-worker of Relator spoke with Patient Y.A.'s family about this issue, and the family still refused to sign the revocation forms. The co-worker asked Relator for guidance and Relator referred her co-worker to speak with her superiors. A week later, Relator was faxed a revocation package concerning Patient Y.A. containing a revocation form that had altered signatures on it from Patient Y.A.'s representative. Specifically, it appeared as if the signatures were cut from one

11

form, pasted onto the revocation form and then copied to give the appearance of a genuine signature.

27.

Many times scheduled face to face encounters were missed due to Serenity employees failing to attend such encounters. When this occurred, Serenity nonetheless fabricated records to give the appearance these encounters occurred.

28.

In an effort to improve their beneficiary count as it relates to their annual cap, Serenity admits patients to hospice without the written approval of the patients' attending physician. Specifically, Patient A.N. was admitted to Serenity without the signature of Patient A.N.'s attending physician. When asked to sign Patient A.N.'s hospice election, after it was already 30 days delinquent, Patient A.N.'s attending physician refused to sign the election form because he had never given Serenity consent to admit Patient A.N. to hospice.

29.

Patient J.S. was similarly admitted to Serenity, without the consent of Patient J.S.'s attending physician, after being visited by Serenity employees at Oconee Regional Medical Center. Both the attending physician and the hospitalist who were treating Patient J.S. refused to sign the election form when Serenity requested their signature after Patient J.S. had already been admitted.

30.

Relator was tasked with entering data concerning employee visits to Serenity's patients. She was specifically instructed by her supervisor that when entering the units of time for said units, she was to round up and never round down. This practice of rounding up is specifically prohibited by Medicare and Medicaid regulations and falsely inflates the record of time Serenity employees spend treating patients.

31.

Serenity's employee, Dr. Dsouza routinely, and falsely, bills his patient interactions to the next highest degree of specificity. Serenity, and its CEO Don Copeland, are aware that Dr. Dsouza up-codes his patient interactions, and even scheduled a meeting with him to address the issue, but even after the meeting Dr. Dsouza's upcoding continued.

32.

Serenity and its CEO, Don Copeland, are aware of conduct of the nature described in the Complaint. When Relator was informed of an administrator's plan to backdate a revocation of Serenity's patient in the event that the hospital treating the patient entered a diagnosis related to the patient's terminal illness, (*See* ¶¶ 19-21, *supra*) she informed her superiors that such a plan was "illegal."

33.

13

Shortly thereafter, the administrator's plan was discussed by Relator with Don Copeland, and she reiterated her statement that the plan was illegal. When asked by Mr. Copeland how she knew it was illegal, Relator and another participant in the conversation told him that this conclusion was based on the CMS regulations as described in the CMS Manual.

34.

In or about July 2012, Serenity employees were not following up on their Medicare patients' statuses and were submitting this required information outside the required timeframe. Relator was directed by her supervisor to create some sort of confirmation record that would give the appearance that the statuses being submitted were submitted prior to their becoming delinquent. When Relator explained she didn't have a confirmation to send because confirmation was never done, the supervisor told Relator she "better get one from somewhere." Relator then complained of her supervisor's direction to make up a status confirmation, believing such conduct to constitute fraud.

35.

Relator's supervisor was upset by Relator's complaint about the supervisor's request that she fabricate confirmations in furtherance of Defendant's scheme to defraud Medicare and Medicaid.

36.

14

Relator was terminated shortly after her complaint about being asked to commit fraud. Said termination was in retaliation for her complaint about her supervisor and in retaliation for her previous questioning of Defendant's billing practices to Defendant's CEO.

## COUNT I – FEDERAL FALSE CLAIMS ACT CLAIMS

37.

Relator realleges and incorporates by reference paragraphs 1 through 36 as though fully set forth herein.

38.

Defendant presented, or caused to be presented, to the United States government, through its intermediaries, false or fraudulent claims for payment, or made, used, or caused to be made or used a false record or statement to get a false or fraudulent claim paid by the United States government, as alleged herein, in violation of the False Claims Act, 31 U.S.C. § 3729(a).

39.

Defendant presented, or caused to be presented, claims for reimbursement of services, and received payment for hospice services provided to patients who were not eligible for hospice services, for hospice services provided to patients with false or fraudulently determined terminal illnesses, for services not rendered, for up-coded services, or for services rendered after the fraudulent termination or

15

revocation of hospice election of certain patients in an effort to be paid for said services and not have it count against Defendant's aggregate cap.

40.

Such claims were presented to, and payments received from, the Medicare or Medicaid programs, and Defendant either knew such claims were false or fraudulent, or acted with reckless disregard or deliberate ignorance of the truth or falsity of the claims. Defendant has failed to reimburse the United States for all such payments received.

41.

Under the terms of the False Claims Act, Defendant is liable for a penalty of from $5,500 to $11,000 for each false claim submitted for payment under the Medicare or Medicaid programs, as described herein, plus three (3) times the amount of damages that the Government sustained because of the acts of Count III Defendants.

## COUNT II – ILLEGAL RETALIATION UNDER FEDERAL FALSE CLAIMS ACT

42.

Relator re-alleges and incorporates by reference paragraphs 1 through 41 as though fully set forth herein.

43.

16

As set forth above, Relator investigated and later reported the falsification of records and other fraudulent activities she observed while employed by Defendant.

44.

In July 2012, Relator was terminated from her position of employment with Defendant.

45.

Such termination was in retaliation for Relator's protected conduct, her lawful reporting of acts and omissions on the part of Defendant that were in furtherance of violations of the False Claims Act, and her attempts to stop said violations.

46.

Pursuant to 31 U.S.C. § 3730(h)(2), Defendant is liable to Relator for two times the back pay, interest on said back pay and for litigation costs and attorneys fees.

WHEREFORE, Plaintiff prays as follows:

(a)     That judgment be entered against the Defendants, jointly and severally, in an amount equal to three times the actual damages;

(b)     That the Defendants be ordered to pay a civil penalty equal to between $5,000 and $10,000 for each False Claims Act violation;

(c)     That Defendants be ordered to pay costs and all expenses, including reasonable attorneys fees, for the prosecution of this action;

(d)     That the qui tam relator be awarded 25% of any recovery or settlement in this action if the United States intervenes, or 30% if the United States does not intervene, and as otherwise provided by law;

(e)     For trial by jury; and

(f)     For any and all further relief as the Court deems just and appropriate.

This 3rd day of January, 2013.

Respectfully submitted,


By:     _____

        J.D. Dalbey
        Georgia Bar No. 003150
        Brian F. McEvoy
        Georgia Bar No. 490845

        Counsel for Relator

Chilivis, Cochran, Larkins & Bever, LLP
3127 Maple Drive, NE
Atlanta, Georgia 30305
(404) 233-4171
(404) 261-2842 (Fax)
jddalbey@cclblaw.com
bfm@cclblaw.com

18